**James L. BUCHANAN, W.K. Seals, and Genevieve R. Brooks, Plaintiffs,**

v.

**The CITY OF JACKSON, TENNESSEE; Board of Commissioners of the City of Jackson; Robert D. Conger, Individually and as Mayor and Commissioner of Public Affairs, Public Safety, Revenue and Finance; Ben Langford, Individually and as Commissioner of Education, Parks, Recreation and Public Property; and Johnny Parham, Individually and as Commissioner of Streets, Health and Sanitation and Public Improvements, Defendants.**

No. 77–1022.

United States District Court, W.D. Tennessee, E.D.

Jan. 5, 1988.

As Amended Feb. 23, 1988.

---

**19.** *See* this Order at 2 and accompanying footnotes 4 and 5.

1516

Richard Dinkins, Nashville, Tenn., and Napoleon B. Williams, Jr., Legal Defense Fund, New York City, for plaintiffs.

Harold Johnson, Jackson, Tenn., and William S. Rhyne, Washington, D.C., for defendants.

## MEMORANDUM OPINION

TODD, District Judge.

### I. HISTORY OF THE CASE

Plaintiffs filed this action in 1977 challenging the at-large electoral scheme for electing members of the Board of Commissioners of the City of Jackson, Tennessee. Plaintiffs are black voters of Jackson, each of whom has resided and has been active in civic affairs in Jackson for many years.[1] The complaint was filed as a class action on behalf of all black voters in Jackson, but no such class was ever certified. Defendants are the City of Jackson, its Board of Commissioners as a body, and the three incumbent commissioners.[2]

The complaint originally stated claims for relief under the Thirteenth, Fourteenth, and Fifteenth Amendments to the Constitution of the United States and 42 U.S.C. §§ 1981, 1983, 1985, 1986, 1988, and 2000d. Jurisdiction was based upon 28 U.S.C. §§ 1331 and 1343.

Specifically, plaintiffs asserted that the at-large voting procedure with a run-off provision used by Jackson to elect its three-member Board of Commissioners diluted the voting strength of black citizens and deprived them of meaningful participation in the city's political processes.

In October 1980 defendants moved for summary judgment. This court (Horton, J.), on the basis of *Mobile v. Bolden*, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), granted summary judgment on March 31, 1981, holding that "plaintiffs and black voters in Jackson register and vote without hindrance" and that "[d]efendants have not endorsed, adopted, or enforced discrimination against blacks as alleged by plaintiffs." *Buchanan v. City of Jackson*, order granting summary judgment at 3–4. Plaintiffs subsequently appealed the grant of summary judgment to the United States Court of Appeals for the Sixth Circuit.

After the appeal was taken, but before the Court of Appeals rendered its decision

---

1. Rev. W.K. Seals died during the pendency of this action and no substitution of party in his place has been made.

2. The Governor of Tennessee was originally a defendant but was dismissed before trial.

in this case, the Supreme Court's opinion in *Rogers v. Lodge*, 458 U.S. 613, 102 S.Ct. 3272, 73 L.Ed.2d 1012 (1982), was published. Although the Court of Appeals agreed with this court that plaintiffs had failed to state a claim under the Fifteenth Amendment upon which relief could be granted,[3] it vacated the summary judgment order and remanded the case for consideration in light of *Rogers* and a recent amendment to the Voting Rights Act of 1965, 42 U.S.C. § 1973 *et seq.* 708 F.2d 1066 (6th Cir.1983).

Upon remand, plaintiffs amended their complaint to allege a violation of the Voting Rights Act of 1965. Defendants' second motion for summary judgment was denied, and trial was held in October and November 1986, lasting a total of nineteen days. At the conclusion of the trial, the court took the matter under advisement to await the preparation of a transcript and the filing of post-trial briefs by the parties.

Based upon the evidence presented, the post-trial briefs submitted by the parties, and the entire record in this cause, the court issues this memorandum opinion which includes findings of fact and conclusions of law as required by Fed.R.Civ.P. 52(a).

## II. APPLICABLE LAW

Although the case was remanded to this court with instructions to reconsider the Fourteenth Amendment claim in light of *Rogers v. Lodge*, plaintiffs elected at trial to proceed primarily upon the claim that Jackson's system of at-large elections with runoffs violates § 2 of the Voting Rights Act of 1965 (the Act), as amended in 1982. Because plaintiffs impliedly abandoned their Fourteenth Amendment claim, it is unnecessary for this court to analyze the evidence under the *Rogers v. Lodge* standard.

■ Section 2 of the Act as amended in June 1982, 42 U.S.C. § 1973, provides:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section.

(b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

It is clear from the legislative history of the 1982 amendments that § 2 was amended by Congress as a result of the Supreme Court's decision in *Mobile v. Bolden, supra,* that a discriminatory intent must be proven in order to find an election scheme unconstitutional. In the words of the Senate Judiciary Committee's report on § 2, the "amendment to the language of Section 2 is designed to make clear that plaintiffs need not prove a discriminatory purpose ... in order to establish a violation of [Section 2]." S.Rep. No. 97–417, 97th Cong., 2d Sess. 27, *reprinted in* 1982 U.S.Code Cong. & Ad.News 177, 205 (hereinafter cited as S.Rep.). The impetus behind the Senate's explicit rejection of *Bolden's* requirement of proving intent was what the Senate Report termed the "ultimate test" of the Act, "whether, in the particular situation, the practice operated to deny the minority plaintiff an equal opportunity to participate and to elect candidates of their [sic]

---

**3.** Plaintiffs did not pursue their statutory and Thirteenth Amendment claims on appeal.

choice." S.Rep. at 30, 1982 U.S.Code Cong. & Ad.News at 207.

Subsection (b) of § 2 of the Act permits a plaintiff to establish a violation of the Act if the "totality of the circumstances" shows a discriminatory intent *or* result. S.Rep. at 27. The Senate Report indicates that a finding of discriminatory intent may be made upon either direct or indirect proof. *Id.* at n. 108. According to the report, a finding of discriminatory result is made by assessing the impact of the challenged electoral system on minorities based upon objective factors.[4] S.Rep. at 27. Typical factors a court might consider in this assessment include:

1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals;

7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

Additional factors that in some cases have had probative value as part of plaintiffs' evidence to establish a violation are:

whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group.

whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

S.Rep. at 28–29, 1982 U.S.Code Cong. & Ad.News 1982, at 206, 207 (footnotes omitted). Three things should be noted about the Senate committee's enumeration of the above factors. First, the list is based upon the Supreme Court's analysis in *White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), as articulated by the Fifth Circuit in *Zimmer v. McKeithen,* 485 F.2d 1297 (1973). S.Rep. at 28. Second, the list was not intended by the committee to be all inclusive. *Id.* at 29. Third, the list is not to be used by a court as a "mechanical 'point counting' device" in which the evidence for each side is simply tallied up with the court granting judgment for the party that scores the most points. S.Rep. at 29, n. 118. Instead, the list should be used only as a guide for the court in its evaluation of the totality of the circumstances surrounding the challenged voting scheme.

Several comments by the Senate committee should also be noted. First, the committee recognized that no group has a right to proportional representation and that at-large systems are not *per se* a violation of the Act. S.Rep. at 23–24. Second, § 2 was not intended by Congress to require racial quotas in local governments. *Id.* at 27. Finally, and most importantly, under the results test, a plaintiff who establishes only the existence of at-large voting, underrepresentation of minorities, and one addition-

---

4. Although a finding of discriminatory intent may be made on the basis of such circumstantial evidence, there is no need to infer a discrim- inatory intent if the court is able to make a finding of vote dilution based upon the objective factors. S.Rep. at 28, n. 112.

al relevant factor has *not* sufficiently shown a violation of the Act. *Id.* at 33. It is only when the totality of the circumstances establishes that a particular voting procedure has a discriminatory result that a court may find a violation of the Act.

The Supreme Court had its first opportunity to construe § 2 of the Voting Rights Act of 1965, as amended, in *Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). The Court held that "[t]he essence of a § 2 claim is that a certain electoral law, practice or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *Id.* 106 S.Ct. at 2764–2765. Noting that it "has long recognized that multimember districts and at-large voting schemes may 'operate to minimize or cancel out the voting strength of racial (minorities in) the voting population,'" *Id.* 106 S.Ct. at 2765, (citations omitted) the Court pointed out that:

> While many or all of the factors listed in the Senate Report may be relevant to a claim of vote dilution through submergence in multimember districts, unless there is a conjunction of the following circumstances, the use of multimember districts will not impede the ability of minority voters to elect representatives of their choice. Stated succinctly, a bloc voting majority must *usually* be able to defeat candidates supported by a politically cohesive geographically insular minority group. These circumstances are necessary preconditions for multimember districts to operate to impair minority voters' ability to elect representatives of their choice for the following reasons. First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district. If it is not, as would be the case in a substantially integrated district, the *multi-member form* of the district cannot be responsible for minority voters' inability to elect its candidates. Second, the minority group must be able to show

that it is politically cohesive. If the minority group is not politically cohesive, it cannot be said that the selection of a multimember electoral structure thwarts distinctive minority group interests. Third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it ... usually to defeat the minority's preferred candidate. *Id.* 106 S.Ct. at 2765–2767. (emphasis added) (footnotes and citations omitted).

In sum, this court must decide, based upon the totality of the circumstances, and considering the relevant and required factors from the Senate Report and the circumstances described in *Thornburg v. Gingles,* whether Jackson's system for electing its Board of Commissioners fails to provide black citizens equal opportunity with white citizens to participate in the political process and to elect representatives of their choice.

## III. DISCUSSION

### A. THE CHALLENGED SYSTEM

■ The City of Jackson was incorporated in 1822, but popular election of City officials did not occur until 1837 when provision was made for a City Board of Aldermen, elected at-large. In 1854, the Board of Aldermen had eight members, with two elected from each of four election districts. Although Jackson's Charter was repealed by referendum in 1907, the City was reincorporated without substantial change in the form of government.

In 1915, Jackson's form of government was changed to a three-man commission, with each of the commissioners elected at-large by all the voters of the City.[5] Each commissioner was assigned specific duties by the city charter: the Mayor served as Commissioner of Public Affairs, Public Safety, Revenue and Finance, and the other commissioners served as the Commissioner of Streets, Sewers, Public Improvements and Public Utilities, and the Commissioner of Health, Education, Parks, and Public Property. In addition to these individual

---

5. 1915 Tenn.Priv.Acts, Ch. 168, Sec. 2.

administrative duties, the Board of Commissioners as a body exercised the legislative power of the City. As each of the individual commissioners had duties to fulfill with regard to the City as a whole, this form of government was accompanied by at-large election of the commissioners, since it was not desirable to have, for example, the Commissioner of Public Safety elected by one district and the Commissioner of Education elected by another district. This three-man commission form of government has remained substantially unchanged since 1915.

Plaintiffs submitted evidence which they contend proves that Jackson adopted the commission form of government in order to prevent the election of blacks to the Board. Defendants have presented evidence which they contend proves that the commission form of government was not adopted for a discriminatory purpose and has not been maintained for such a purpose. However, proof of discriminatory intent is not required in a Voting Rights Act § 2 claim in view of the language of the Supreme Court in *Thornburg v. Gingles:*

> [T]he [Senate] Report dispositively rejects the position of the plurality in *Mobile v. Bolton,* 446 U.S. 55 [100 S.Ct. 1490, 64 L.Ed.2d 47] (1980), which required proof that the contested electoral practice or mechanism was adopted or maintained with the intent to discriminate against minority voters. The intent test was repudiated for three principal reasons—it is "unnecessarily divisive because it involves charges of racism on the part of individual officials or entire communities," it places an "inordinately difficult" burden of proof on plaintiffs, and it "asks the wrong question." The "right" question, as the Report emphasizes repeatedly, is whether "as a result of the challenged practice or structure plaintiffs do not have an equal opportunity to participate in the political processes and to elect candidates of their choice." 106 S.Ct. at 2763 (citations and footnotes omitted).

Thus, it is not necessary to determine if the system for electing Jackson's Board of Commissioners was adopted or has been maintained with a discriminatory intent. The proper inquiry is whether it has a discriminatory *effect.*

## B. EXTENT OF HISTORY OF OFFICIAL DISCRIMINATION WHICH TOUCHED THE RIGHT OF BLACK CITIZENS TO PARTICIPATE IN THE DEMOCRATIC PROCESS

■ Prior to the Civil War, most black persons in Tennessee and other states throughout the South were held in slavery. In 1834 the Constitution of Tennessee provided that even those few blacks who were free did not have the right to vote or to testify in court. At the outbreak of the Civil War, 98% of black persons in Tennessee were slaves. After the Civil War, although slavery had been abolished, most black people in Tennessee were unable to achieve full equality and participation in American life. Although in the late 1860's blacks obtained the right to vote, the right to hold office, and the right to sit on juries, they were still excluded from many jobs, received low salaries, had inadequate education, and were denied equal protection by law enforcement officials.

In the 1880's, blacks were able to gain a certain amount of political power. During that time, twelve black legislators, nine of whom were from West Tennessee, served in the Tennessee General Assembly. Soon thereafter, however, the Tennessee legislature passed legislation which had a significant detrimental impact upon black political power. First, a law was passed which required all voters to register at least twenty days before each election and to show proof of that registration prior to voting. Because of the additional effort required to register and vote, poor voters were significantly more affected because they were much less mobile. Second, a law was passed which required that state and local election ballots be placed in a ballot box that was separate from the federal election ballot box. As a result, uneducated voters were less able to accurately determine into which ballot box they should place their ballot. Third, a law was passed providing for secret ballots which required voters to

be able to read the names on the ballot rather than to merely ask for ballots by party name. Black voters were less able to properly cast a vote on a secret ballot since only twenty-five years earlier it had been illegal to teach black people to read. Finally, in 1890, the legislature passed a law establishing a poll tax.

The difficulties which black voters faced in exercising their political rights were described by Robert H. Cartmell, a farmer in the Jackson area, who wrote in his diary in 1892:

> The man that can't read will have some difficulty in fixing up his vote. Few Negroes voted today. Under the present system, a man's vote is worth something and is not killed by a number of ignorant Negroes. White folks ought to govern the country, and they will.

It was within this historical context that cities in Tennessee began to adopt the commission form of government.[6] Jackson's adoption of this system in 1915 made it one of some dozen or so Tennessee cities to have a commission.

Since 1915, the Board of Commissioners in Jackson has consisted of three members with each member running for election at-large for a designated seat. The 1915 Charter contained a runoff provision which provided that, after a non-partisan primary election at-large, the two candidates receiving the most votes for each commission seat would run again in a second election. The payment of poll taxes for other voters was prohibited and a $300 fine and thirty-day jail term was imposed for each violation. In 1923, the Charter was amended to provide for a single at-large election with a runoff only in case of a tie. In 1935, the Charter was amended to provide for partisan nominating primaries, again with a runoff in case of a tie. In 1969, the Charter was amended once again to eliminate the partisan primaries, and to provide for a non-partisan general election, with a runoff if no candidate received in the general elec-

tion a majority of the vote for a particular office. The 1969 Charter amendments also increased the candidate filing fee from $5 to $100 in order to eliminate frivolous qualifications. Elections to the Board are held every four years in June.

In accordance with Tennessee statutes and the governing Charter, all legislative and executive powers of the City of Jackson are vested in the Board of Commissioners. Each commissioner exercises his or her prescribed executive powers subject to the supervision of the Board of Commissioners as a whole. The Charter grants the Board the power to tax, contract, borrow and spend money, own or control property, condemn, grant franchises, issue licenses, create misdemeanors and impose fines, and make regulations protecting the health, morals, comfort, safety, convenience, or welfare of the city's inhabitants.

All current members of the Board of Commissioners of the City of Jackson are white. In recent years, black candidates have run for seats on the Board, but each of these candidates has been defeated either in the general election or in the runoff. Since the commission form of government was adopted in Jackson in 1915, no black person has ever been elected to, or served on, the Board of Commissioners.

The City of Jackson has a history of official discrimination that parallels the history of the State of Tennessee as a whole. State law at one time consigned black people to slavery. After slavery was abolished, state law prevented blacks from voting or holding political office. Although there is no evidence that the City of Jackson had any comparable ordinances which allowed slavery or prevented blacks from voting or holding office, the City did not exist in a vacuum; consequently, state law had an impact upon black residents of the City.

For much of its history, the City of Jackson, through its commissioners, has en-

---

6. Clarksville adopted the commission form of government in 1907, Chattanooga and Knoxville adopted it in 1911, and Nashville adopted it in 1913. In 1913, the Tennessee legislature passed an act permitting cities to change their charter to allow a commission form of government without requesting special acts from the legislature. Jackson, however, adopted its commission system by a special act of the legislature.

forced segregation by race in its public facilities. Jackson operated a racially segregated public school system until the schools were desegregated by order of this court. Public restrooms, parks, and recreation facilities were segregated by race. Public water fountains and public transportation provided different facilities for blacks and whites. In addition, the City of Jackson employed no black supervisors, black policemen, or black firemen until 1955. Up to that time, Jackson also had employed no black secretaries or black white collar workers except as teachers or principals in all black schools. The Board of Commissioners has never appointed a black person as head of the school system, the fire department, the police department, the street department, the building department, the planning department, or the parks and recreation department.

Although substantial progress has been made in recent years and under the current Board of Commissioners, Jackson historically has been a segregated city. Because of the adverse effect which segregation has had upon the socioeconomic status of black citizens, including education, income, employment, and living conditions, discussed *infra*, black citizens have not been able to participate fully in the political process. The court, therefore, concludes that the City of Jackson has a history of official discrimination that touched the right of black people to register, vote, or otherwise participate in the democratic process.

## C. THE EXTENT TO WHICH VOTING IS RACIALLY POLARIZED

The Supreme Court in *Thornburg v. Gingles* discussed the standard for legally significant racial bloc voting. The Court stated:

> The Senate Report states that the "extent to which voting in the elections of the ... political subdivision is racially polarized," is relevant to a vote dilution claim. Further, Courts and commentators agree that racial bloc voting is a key element of a vote dilution claim. Because, as we explain below, the extent of bloc voting necessary to demonstrate that a minority's ability to elect its pre-

> ferred representatives is impaired varies according to several factual circumstances, the degree of bloc voting which constitutes the threshold of legal significance will vary from district to district. Nonetheless, it is possible to state some general principles and we proceed to do so.
>
> The purpose of inquiring into the existence of racially polarized voting is twofold: to ascertain whether minority group members constitute a politically cohesive unit and to determine whether whites vote sufficiently as a bloc usually to defeat the minority's preferred candidates. Thus, the question whether a given district experiences legally significant racially polarized voting requires discrete inquiries into minority and white voting practices. A showing that a significant number of minority group members usually vote for the same candidates is one way of proving the political cohesiveness necessary to a vote dilution claim, and, consequently, establishes minority bloc voting within the context of § 2. And, in general, a white bloc vote that normally will defeat the combined strength of minority support plus white "crossover" votes rises to the level of legally significant white bloc voting. The amount of white bloc voting that can generally "minimize or cancel," black voters' ability to elect representatives of their choice, however, will vary from district to district according to a number of factors, including the nature of the allegedly dilutive electoral mechanism; the presence or absence of other potentially dilutive electoral devices, such as majority vote requirements, designated posts, and prohibitions against bullet voting; the percentage of registered voters in the district who are members of the minority group; the size of the district; and, in multimember districts, the number of seats open and the number of candidates in the field.

106 S.Ct. at 2769–2770 (citations omitted).

### 1. *Compactness*

■ The court concludes from the evidence that the population of black voters in

Jackson is sufficiently large and geographically compact to constitute a majority in a single member district. Census data introduced at the trial showed a total population for the City of Jackson in 1980 of 49,074, of which 16,847, or 34.3%, were black. The black and white population groups were distributed throughout seventeen precincts. Of these seventeen, there were three which were contiguous and had over 70% black population; two more precincts with over 58% black population were contiguous to these three. In 1970, there were twenty precincts, five of which had black populations of 66.5% or higher.

An analysis of the 1980 population by census tract data leads to the same conclusion. Of the sixteen census tracts into which Jackson was divided in 1980, six were more than 59% black. At least 49.2% of the population of those six precincts were black residents who were eighteen years of age or older. Black citizens of Jackson are therefore sufficiently geographically compact within certain precincts or census tracts that they would constitute a majority in an appropriately drawn single-member district.

### 2. *Cohesiveness*

■ Plaintiffs' expert witness, Dr. James Loewen[7], testified that "[t]he black vote is cohesive. The white vote is also cohesive." T. 536. Dr. Loewen further testified that "whenever there was a black-white contest, their [black voters'] support for the black candidate is overwhelming and indicates that they would elect a candidate of their choice and that that candidate would, in fact, be black ..." T. 536–7.

Defendants' expert, Dr. Charles Bullock,[8] agreed that black voters in Jackson were cohesive. Although Dr. Loewen and Dr. Bullock disagreed as to whether white voters are cohesive, this court does not need to make that determination. The Supreme Court in *Gingles* indicated that cohesiveness of the minority must be present as

one of the requirements of a § 2 claim. However, plaintiffs must show only that "whites vote sufficiently as a bloc" usually to defeat the preferred candidates of the minority. *Gingles*, 106 S.Ct. at 2769. Thus, there is a distinction between minority "cohesiveness" and majority "bloc voting."

Bloc voting by blacks tends to prove that the black community is politically cohesive, that is, it shows that blacks prefer certain candidates whom they could elect in a single-member, black majority district. Bloc voting by a white majority tends to prove that blacks will generally be unable to elect representatives of their choice.

*Id.*, 106 S.Ct. at 2776.

Because Dr. Loewen and Dr. Bullock agree that black voters in Jackson are cohesive, and because the evidence to that effect is uncontradicted, the court concludes that the black community is politically cohesive.

### 3. *Racial Polarization in Voting in Jackson*

Plaintiffs' expert witness, Dr. Loewen, testified during the trial that elections to the Board of Commissioners in Jackson were racially polarized. Dr. Bullock, defendants' expert witness, agreed that voting had been highly polarized in all five of the contests since 1975 in which a black candidate opposed a white candidate. Dr. Bullock, however, contended that not all elections have been polarized and that black voters had been able to elect candidates of their choice.

■ Dr. Loewen and Dr. Bullock disagreed upon the definition of "polarization." Dr. Loewen testified:

I use a measure for polarization which has been used by many other people since I developed it; and it, furthermore, has been developed independently by some other people. And I call it the 160

---

7. Dr. Loewen is a Professor of Sociology at the University of Vermont and an expert in the analysis of racial polarization and voting.

8. Dr. Bullock is a Professor of Political Science at the University of Georgia and an expert in the analysis of voting patterns in municipal elections.

percent rule. And it's the highest measure, it's the most stringent measure of extreme polarization that I know of before I read—I might say, before I read the deposition of Dr. Bullock. The 160 percent rule is as follows....

....

The percentage of whites voting white plus the percentage of blacks voting black must total above 160 percent for me to apply the term "extremely polarized." That is to say, for instance, when we look at the first race, we look at Table 1, we see that the first race shows the whites voting 93.7 percent white and the blacks voting 99 plus percent black. Well, that's 93.7 percent in one direction and 99 percent in the other direction. I add those two together; and, of course, I get 192.7 percent. That's well above 160 percent. Eighty-eighty, I would call extremely polarized.

....

... I would use the term substantially or moderately polarized for elections that come in between 140 percent and 160 percent when you sum the polarization on both sides. And, finally, I would use the term somewhat polarized for elections that come between 120 percent and 140 percent when the polarization on both sides is summed.

....

... [M]y definitions are considerably more stringent than those in the *Gingles* decision.

....

The *Gingles* decision, as I read it, states that when the black community votes differently than the white community, an election is polarized. I read that to mean, for instance, that if the black community votes, let's say, 58 percent for black candidates, and the white community votes 58 percent for white candidates—... they would consider that polarized, 58–58....

....

... [M]y own definition of polarized voting is more stringent than that.

T. 512–516

Dr. Bullock described a racially polarized election as "one in which the overwhelming proportion of blacks voted for one candidate and an overwhelming proportion of whites voted for an opposite candidate." T. 1524. Dr. Bullock described "overwhelming" as being "in the neighborhood of 90 percent." T. 1536. Dr. Bullock formulated his definition of racial polarization without reference to the literature, the views of his peers, or any court decision.

The Supreme Court has described racial polarization as "simply that the race of voters correlates with the selection of a certain candidate or candidates; that is, it refers to the situation where different races ... vote in blocs for different candidates." *Gingles*, 106 S.Ct. at 2773.

This court concludes that the evidence overwhelmingly and dramatically shows that racially polarized voting exists in Jackson. Dr. Bullock's definition of racially polarized voting is rejected for the following reasons: 1) Dr. Bullock's definition is more stringent than Dr. Loewen's, 2) Dr. Bullock's definition is not based upon commonly accepted literature or the views of his peers, and 3) Dr. Bullock's definition is far more restrictive than the Supreme Court's definition in *Gingles*. The difference in opinion between Dr. Loewen and Dr. Bullock in this case, however, is not completely a result of their differing definitions. They arrived at contrasting conclusions because they considered data from different elections. For reasons stated below, the court accepts the testimony of Dr. Loewen that voting in Jackson has been racially polarized and rejects the testimony of Dr. Bullock that blacks have been able to elect candidates of their choice.[9]

Both Dr. Loewen and Dr. Bullock analyzed elections covering the period 1967 through 1983 for which reliable statistics

**9.** Plaintiffs contend that Dr. Bullock's testimony should be rejected since it has been rejected in other cases. *See McNeil v. City of Springfield, Ill.*, 658 F.Supp. 1015 (C.D.Ill.1987). However, since Dr. Loewen and Dr. Bullock disagree in this case primarily because they analyzed different elections, and since this court has rejected Dr. Bullock's definition of racially polarized voting, it is not necessary to rely upon another court's opinion of Dr. Bullock's testimony.

are available.[10] Because the race of a voter is not recorded on his ballot, and because voter registration figures are not maintained showing race, Drs. Loewen and Bullock made estimates from population figures and election returns of the percentage of votes cast by black and white voters for each candidate. (No other minority exists in significant numbers in Jackson.) They used two accepted statistical techniques, one to estimate the racial composition of the vote from the entire city and another based on the election precincts which were most homogeneous racially.[11]

### (a) Election Campaigns by Black Candidates Against White Candidates

■ Dr. Loewen used ecological regression techniques in contests involving black candidates opposing white candidates to determine the extent of racial bloc voting in Jackson.[12]

Table 1

Ecological Regression Results, Racial Bloc Voting, Jackson, TN.

| Election | | % of Whites Voting White | % of Blacks Voting Black | r | r² (in %) |
|---|---|---|---|---|---|
| 6/3/75, | Commissioner of Public Improvements | .93.7 | 99+ | .92 | 83.9 |
| 6/10/75, | same, runoff | 89.7 | 99+ | .92 | 85.4 |
| 2/22/77, | Public Service Commissioner | 95.0 | 99+ | .91 | 82.8 |
| 3/1/77, | same, runoff | 88.7 | 99+ | .89 | 79.2 |
| 5/3/83, | Commissioner of Education | 86.6 | 99+ | .97 | 94.6 |

Since 1975, there have been five elections involving black and white candidates for City Commissioner of Jackson. In the June 3, 1975 election there were three candidates for Commissioner of Streets, Health and Sanitation, and Public Improvements. They were R.E. Bailey, Sr., (white);

Sidney David (white); and Wesley C. McClure (black). In that election, approximately 99% of blacks who voted cast their ballots for the black candidate McClure and 93.7% of whites who voted cast their ballots for a white candidate.

In the June 10, 1975 runoff election between the two candidates with the largest number of votes, Bailey and McClure, 89.7% of white voters voted for Bailey, the white candidate, while 99% of the black voters voted for McClure, the black candidate.

In the preliminary election, McClure received 33.8% of the total votes cast while Bailey received 38.4% of the votes. In the runoff election, Bailey picked up enough votes from supporters of the defeated white candidate, David, to increase his total to 62.7% of the vote while McClure increased his total to only 37.3% of the vote.

In the February 22, 1977 election for Commissioner of Streets, Health and Sanitation, and Public Improvements, there were five white candidates and one black candidate. In the preliminary election, McClure, the black candidate, received the highest number of votes which was approximately 30.9% of the total. Defendant Parham, a white candidate, received the next highest number of votes, which was 29.4% of the total. In the March 2, 1977 runoff election, Parham picked up enough votes from supporters of the losing candidates to receive 59.4% of the total vote. McClure picked up enough votes from supporters of the losing candidates to receive 40.3% of the total vote. In that runoff, approximately 88.7% of the white voters cast their ballots for the white candidate, Parham, and over 99% of the black voters cast their ballots for the black candidate, McClure.

**10.** Dr. Loewen analyzed black versus white races since 1975. Dr. Bullock analyzed all races since 1967.

**11.** The first technique is ecological regression analysis. Dr. Loewen described the second method as "overlapping percentages" while Dr. Bullock described it as "extreme case analysis." Both methods are "standard in the literature for the analysis of racially polarized voting." *Gingles,* 106 S.Ct. at 2768, n. 20.

**12.** Table 1, Exhibit 29, was prepared by Dr. Loewen. In these same five black versus white contests, Dr. Bullock's conclusions were not significantly different. However, because Dr. Loewen's testimony has been found to be more credible, Dr. Bullock's calculations for these elections have not been used. The symbols "r" and "r²" are discussed in footnote 15, *infra.*

In the May 1983 election for Commissioner of Education, Parks, Recreation and Public Property, the white candidate, defendant Langford, defeated the black candidate Owens. Over 99% of the black voters voted for Owens while 86.6% of the white voters voted for Langford.

Based upon these five elections since 1975 in which a black candidate opposed a white candidate, plaintiffs' expert witness concluded that elections for the Jackson City Commission have been polarized.

#### (b) All Contested Election Campaigns, Including Those Consisting of Only White Candidates

The following table [13] was prepared by defendants to support their contention that voting in Jackson has not been sufficiently racially polarized to allow a bloc voting white majority to usually defeat candidates favored by black voters.

| Election | Black-Supported Candidate Led or Won |
|---|---|
| 1983 General—Mayor | Yes |
| 1983 General—Education | No |
| 1979—Mayor | Yes |
| 1977 General—Streets | Yes |
| 1977 Runoff—Streets | No |
| 1975 General—Public Improvements | No |
| 1975 Runoff—Public Improvements | No |
| 1971 General—Mayor | Yes |
| 1971 General—Education | No |
| 1971 General—Utilities | No |
| 1971 Runoff—Mayor | Yes |
| 1967 Primary—Mayor | Yes |
| 1967 Primary—Utilities | No |
| 1967 General—Mayor | Yes |

Defendants contend that the candidates favored by black voters led or won in half of the fourteen elections since 1967. Consequently, defendants contend that plaintiffs have failed to prove that the candidates favored by black voters are usually defeated.

#### (c) Whether Blacks Have An Opportunity to Elect Candidates of Their Choice

The experts have reached different conclusions about the ability of black voters in Jackson to elect candidates of their choice. Dr. Loewen, plaintiffs' witness, concluded that black voters in Jackson have had es-

sentially no opportunity to elect the candidates of their choice. Dr. Bullock, defendants' witness, concluded that, since 1967, blacks have supported the candidate who led the primary or won the election in seven of the fourteen races for the Jackson City Commission. The reason for the different conclusions reached by the experts is that Dr. Loewen considered only elections in which a black candidate opposed a white candidate while Dr. Bullock considered all contested elections, including elections in which there was no black candidate. Consequently, plaintiffs contend that the court should consider only elections in which black candidates opposed white candidates as being probative on the issue of the ability of blacks to elect candidates of their choice, while defendants contend that the court must consider all elections.

Clearly, the court may consider all elections in determining whether members of a minority have less opportunity than other members of the electorate to elect representatives of their choice. "Under § 2, it is the *status* of the candidate as the *chosen representative of a particular racial group,* not the race of the candidate, that is important." *Gingles,* 106 S.Ct. at 2776 (emphasis added). That is not to say, however, that all elections must be given equal weight in determining whether black voters in Jackson have less opportunity than white voters to elect representatives of their choice. Certain of the elections in Jackson since 1967, are, because of the circumstances surrounding them, much less probative upon this issue than are others. For example, three of the "elections" relied upon by defendants to support their contention that the candidate supported by black voters "won or led" were only "preliminary" elections resulting in a runoff. In the 1975 race for Streets, Health and Sanitation, and Public Improvements Commissioner, the candidate favored by black voters, Dr. McClure, came in second in the preliminary election and lost in the runoff. In the 1977 race for Commissioner of Streets, Health and Sanitation, and Public

---

**13.** The list of elections is taken from Exh. 68, Table 4, and a "yes" indicates the conclusion of the Plaintiffs' expert that the candidate supported by black voters led or won.

Improvements, Dr. McClure, again favored by black voters, won a plurality in the preliminary election and then lost in the runoff. In the 1971 race for Mayor, the incumbent led the preliminary race and won the runoff.

■ Since § 2 of the Act focuses upon whether members of a protected minority "have less opportunity . . . to participate in the political process *and* to *elect* representatives of their choice" (emphasis added), races in which a candidate merely "led" or qualified for a runoff are not as probative as are races which actually determine the winner.[14] The outcome of an election, not a preliminary or intermediate step in that election, demonstrates whether members of a minority have an opportunity to *elect* candidates of their choice.

■ Defendants submit that "leading" in the preliminary election or qualifying for the runoff is evidence that members of the minority have an opportunity to elect candidates of their choice. However, when the runoff provision of an electoral scheme is challenged, as here, as being one of the features which makes the scheme violative of § 2, evidence that a candidate qualified for the runoff sheds little light upon the ultimate question of whether the electoral scheme violates § 2. Thus, the three elections which resulted in a runoff are not supportive of defendants' claim that the candidates favored by black voters ·are not "usually" defeated.

■ There are other races in the fourteen elections relied upon by Dr. Bullock and defendants which also are not probative on the issue of whether candidates favored by blacks are usually defeated. Defendants contend that, in the race for mayor in 1979, the incumbent Mayor Conger was the choice of black voters. However, defendants' expert testified that the black support for the winner Conger in that election in a heavily black precinct ranged from 0% to 100%. Exh. 68, Table 6. Thus, it is difficult to tell to what extent Conger was the candidate favored by black voters in that election and certainly in that precinct.

In the elections in which Mayor Conger was a candidate, it is difficult to determine the correlation between the race of voters and support for a candidate. Defendants' expert calculated the square of the correlation coefficient ($r^2$) to be .41 for the 1983 ·election, .12 for the 1979 election, .30 for the 1971 preliminary election, .17 for the 1971 runoff, .04 for the 1967 primary election, and .07 for the 1967 general election.[15] Exh. 68, Table 4. With such a relatively wide disparity in the correlation coefficients, and the squares thereof, it is difficult to determine whether, and to what extent, Mayor Conger was the choice of black voters. In addition, two of Mayor Conger's races involved what may be described as token or nominal opposition. In 1979 and 1983, Mayor Conger defeated op-

---

**14.** While preliminary races which lead to a runoff may be probative on the issue of racially polarized voting, they are not necessarily probative on the issue of whether blacks have an opportunity to elect candidates of their choice.

**15.** The "r" is the correlation coefficient which numerically demonstrates "how consistently the electoral support for a candidate or group of candidates varies with the race of the voters in the precinct." *Jackson v. Edgefield County, South Carolina School District,* 650 F.Supp. 1176, 1195 (D.S.C.1986) (citing Engstrom and McDonald, Quantitative Evidence in Vote Dilution in Litigation; Political Participation and Polarized Voting, 17 Urban Lawyer 369, 371 (Summer 1985)). The correlation coefficient can vary from −1.0 through 0 to +1.0. When it is 0, there is virtually no relationship between the race of the voters in a voting district and support for a candidate. The greater the absolute value of the correlation coefficient (the

closer "r" is to −1.0 or to +1.0), the stronger is the correlation between the electoral support for a candidate and the race of the voters in the voting district. Loewen, Vol. 3 at 469. An "r" of .3 to .5 or .6 is considered to be significant (or "good", in the words of Dr. Loewen), showing a relationship. Loewen, Vol 3 at 473. The coefficient "r" *is almost never above .7 and an* "r" above .9 represents an almost perfect correlation between the race of the voters in a voting district and support for a candidate. Loewen, Vol. 3 at 476.

The "r2" is the correlation coefficient multiplied by itself and numerically demonstrates what percent of the variance in voting behavior can be attributed to the racial composition of the voting district. Loewen, Vol. 3 at 471. See also *Jackson ·v. Edgefield County South Carolina School District, supra,* at 1197, n. 3.

ponents who mounted only minimal challenges and who did not seriously campaign for the office.

The races involving Mayor Conger, therefore, offer little support for defendants' contention that the candidates favored by black voters "won or led" in seven of the fourteen races. Defendants' expert admitted that, if the Conger races were omitted, his calculations would show racial polarization in Jackson.[16] Therefore, while all elections are to be considered, elections in which there was a black candidate are more probative in this case upon the issue of whether voting is racially polarized and whether the candidates favored by blacks are usually defeated.

There were also races in which there was no black candidate that showed racial polarization and the inability of blacks to elect candidates of their choice. In 1971, 89.2% of the white voters voted for the white education commissioner, Langford, while 92.6% of the black voters voted against him. Exh. 68, Table 4. Approximately 76.8% of the white voters voted for the white utilities commissioner, Bailey, while 69.4% of the black voters voted against him. *Id.* In 1967, 78.2% of the white voters voted for the white utilities commissioner Bailey, while 59.2% of the black voters voted against him. *Id.* In all three elections in which there was no black candidate, the voting was racially polarized and blacks were unable to elect the candidate of their choice.

There were also elections in which there were no black candidates in which the vote of the black community was irrelevant to the outcome. In the 1967 and 1971 elections for Commissioner of Utilities, both of which were characterized by racially polarized voting, the vote of the black community had no impact upon the outcome. Further, with the possible exception of the 1971 election, black support for Mayor Conger made no difference in his races. In at least three of his races, if not a single black voter had voted for Mayor Conger, the results would have been exactly the same.

In those elections the black voters' support had absolutely no effect upon the outcome.

Clearly, no minority has a right to have an effect upon the outcome of an election, but white versus white races in which black votes are irrelevant do not significantly help the court to decide if candidates favored by black voters are usually defeated by a bloc voting white majority.

Based upon the elections analyzed in this case and the circumstances surrounding those elections, the court concludes that voting in Jackson has been racially polarized and that blacks have had essentially no opportunity to elect candidates of their choice.

D. THE EXTENT TO WHICH THE CITY HAS USED UNUSUALLY LARGE ELECTION DISTRICTS, MAJORITY VOTE REQUIREMENTS, ANTI–SINGLE SHOT PROVISIONS, AND OTHER VOTING PRACTICES OR PROCEDURES THAT MAY ENHANCE THE OPPORTUNITY FOR DISCRIMINATION AGAINST THE MINORITY GROUP

1. *Size of the Election District*

■ The City of Jackson has used the largest possible election district, the entire City of Jackson, in electing its Board of Commissioners. The court accepts the testimony of plaintiffs' witnesses that to mount a campaign throughout an election district as large as the City of Jackson is more difficult for black candidates, who generally have smaller budgets and more limited fund-raising ability, than for whites. Further, black candidates have had only limited success in recruiting white supporters in predominately white neighborhoods to raise money, exhibit yard signs, and campaign door-to-door. Therefore, the size of the election district has had an adverse impact upon the ability of black voters to elect candidates of their choice and has enhanced the discriminatory effect of the present electoral system upon black citizens.

---

**16.** Dr. Bullock also testified that if the McClure races were omitted, there would be little evidence of racial polarization. That conclusion is not supported by the evidence.

### 2. *Majority Vote Requirement*

 The Charter of the City of Jackson, Section 3, provides, in pertinent part:

> In the event no candidate [for one of the commission positions] in one or more of the contests shall receive a majority of the votes cast, a runoff election shall be held on the fifth Tuesday following the election between the two candidates receiving the greatest number of votes for such office or offices. Any candidate receiving a majority of the votes cast in the initial election shall be declared elected and need not appear upon the ballot in the runoff election for other offices if one be required.

The runoff provision of the Charter of the City of Jackson has had an adverse impact upon the ability of black voters to elect representatives of their choice. Although defendants contend that the runoff provision has had an overall neutral effect upon black voters, the evidence does not support such a conclusion. Defendants' contention that the runoff in 1975 "benefitted" Dr. McClure, the candidate favored by black voters, while ingenious, is flawed. Defendants submit that because Dr. McClure finished second in the 1975 preliminary race for Commissioner of Streets, Health and Sanitation, and Public Improvements, the runoff provision actually benefitted him since he got a second chance to campaign. Their argument, however, overlooks the fact that Dr. McClure gained only what the candidate favored by white voters also gained—a chance to run again. Because of the extreme racial polarization and bloc voting present in the runoff election, that was a hollow victory indeed. Although the runoff provision did permit Dr. McClure to campaign again, the fact that he increased his vote from the preliminary election by only 3.9% (from 33.8% to 37.3%) while his opponent increased his vote by 24.3% (from 38.4% to 62.7%) convinces this court that he obtained no "benefit" from the provision. The court, therefore, concludes that the runoff provision in the City Charter had an adverse impact upon the ability of black voters to elect candidates of their choice in the 1977 election and no

ultimate impact upon black voters in the 1975 and 1971 elections.

The runoff provision also has an impact upon minority voters in that it has a chilling effect upon potential black candidates. Given the racial polarization and bloc voting which exist in elections for the Jackson City Commission, any black candidate knows that, even if he qualifies for the runoff, he has no realistic possibility of gathering enough white votes to ultimately prevail. Based upon the results from past elections, the court concludes that the "percentage of whites who refused to vote for black candidates ... would, in the usual course of events, result in the defeat" of a black candidate. *Gingles*, 106 S.Ct. at 2771.

The court, therefore, concludes that the runoff provision of the Jackson City Charter has had and will continue to have an adverse impact upon the ability of black voters to elect commissioners of their choice, particularly if that choice is a black candidate.

### 3. *Anti–Single Shot Provisions*

 While Jackson has no specific prohibition against "single-shot" or "bullet" voting, the nature of the commission form of government effectively precludes "single-shot" voting. Since each candidate for the Jackson City Commission must run for a designated position (one of the three commission posts with specific administrative duties), minority voters are unable to cast "single-shot" votes and thus cumulate their votes.

### 4. *Other Voting Practices*

 Prior to 1979, the Jackson City Charter required that any runoff election for a commission post be held on the second Tuesday following the election. This short interval between the election and the runoff worked to the substantial advantage of a well financed candidate (or one who was able to raise money quickly.) Since black candidates (and white candidates favored by blacks) would likely have had a more difficult time raising campaign funds, a short interval between election and run-

off adversely impacted upon the ability of black voters to elect representatives of their choice, enhancing the opportunity for discrimination against black voters. The Charter was amended in 1979 to provide for a five week interval between the election and any runoff.

## E. CANDIDATE SLATING PROCESS

 The only active organization endorsing candidates in Jackson is the Jackson–Madison County Voters Council, a predominately black organization of which plaintiff James Buchanan has been president since 1954. The Voters Council registers voters and serves as a political action group, educating voters on how to cast their ballots, such as by the use of sample ballots with the names of candidates endorsed by the council listed thereon. The Voters Council has on different occasions endorsed black and white candidates, including the three persons who currently serve on the Board of Commissioners. There is no white organization comparable to the Voters Council nor has there been at least since the time plaintiff Buchanan became involved with the Voters Council. The court, therefore, concludes that blacks are not denied access to any candidate slating process in Jackson.

## F. THE EXTENT TO WHICH BLACKS BEAR THE EFFECTS OF DISCRIMINATION IN SUCH AREAS AS EDUCATION, EMPLOYMENT, AND HEALTH, WHICH HINDER THEIR ABILITY TO PARTICIPATE EFFECTIVELY IN THE POLITICAL PROCESS

 In many objective measures of socioeconomic status, black citizens of Jackson lag behind white citizens.[17] While blacks recently have made significant improvements in certain socioeconomic areas, and in some cases are improving more rapidly than whites, the Court concludes that blacks in Jackson still bear the effects of discrimination which hinder their ability to

participate effectively in the political process.

Blacks in Jackson are employed overwhelmingly in blue-collar occupations (74%), while whites in Jackson are employed overwhelmingly in white-collar occupations (62%). Exh. 11. In 1979, black unemployment was 13.3% while white unemployment was 4.4%. *Id.* In the words of Dr. Loewen, "There are three times as many blacks unemployed, proportionately, as there are whites in Jackson." T. 552. Approximately 29% of all black families in Jackson fall below the poverty line while only 6.6% of all white families in Jackson fall below the poverty line. Exh. 14. The median income of black households in Jackson is $8,994, while the median income of white households is $15,827. Exh. 12. The average income of black households in Jackson is $10,641, while the average income of white households is $19,797. *Id.* Consequently, the average black family in Jackson earns only 53.8% as much as the average white family in Jackson.

In the adult population in Jackson aged twenty-five and over, the median years of school completed in the black community is 10.7. In the comparable white population, the median years of school completed is 12.5 years. Consequently, most white people in Jackson have a high school diploma, while most black people do not. Exh. 9. Of the black citizens in Jackson, 11.1% are illiterate, or semiliterate, while only 3% of the white community are illiterate or semiliterate. Exh. 10.

The median value of owner-occupied housing for blacks is $21,900. The median value of owner-occupied housing for whites is $41,500. Exh. 16. 50% of blacks in Jackson own their own home while 70% of whites own their own home. Of Jackson's black population, 49.3% rent homes, while 29.8% of whites rent. Exh. 15.

While not all of these disparities in earnings, education, and housing are the result of prior discrimination caused by the form of government in Jackson, they are at least

---

17. All of the socioeconomic disparities are certainly not attributable to the form of government which exists in Jackson. Other cities throughout the nation, with other forms of government, exhibit the same phenomena.

partly a result of official discrimination in Jackson. Segregated schools, underemployment (or no employment) in government jobs, the inability to elect candidates who are the choice of black voters, and other more subtle forms of official discrimination have contributed to the current situation of black citizens in Jackson.

These socioeconomic disparities make it more difficult for black citizens to participate in the electoral process. White collar workers can more easily register and vote than blue-collar workers since they have a greater ability to take time off from work. Since black citizens earn less money than white citizens, it is more difficult for a candidate favored by the black community to raise campaign funds. Due to their depressed socioeconomic status, it is more difficult for the black community to mobilize and get black voters to the polls than it is for the white community to do so with white voters. Dr. Loewen testified, and the court finds, that:

> In order to reach the same level of political mobilization, the black community would have to do more work. And if the white community ever was in a position where they needed or felt that they wanted to get more mobilized than they are now, it would be easier for them to do so, given these socioeconomic statistics. T. 556.

The ability of the white community to mobilize voters more effectively than the black community is apparent. From 1967 to 1983, in white versus white elections an average of 26.4% of the white voting age population turned out to vote. The black community, on the other hand, in the same elections, turned out an average of 13.5% of the black voting age population. Dr. Loewen testified, and the court finds, that "[t]he black community is so undermobilized in white-white contests that the term apathetic might reasonably be applied." T. 563. In black versus white contests, however, the black community turned out to vote at a rate of 32.7%, which is comparable to the white turnout in white versus white elections. In black versus white elections, the white community turned out at a rate of 41.1%.

The court, therefore, concludes that blacks in Jackson bear the effects of discrimination in such areas as education and employment which hinder their ability to participate effectively in the political process.

## G. WHETHER POLITICAL CAMPAIGNS HAVE BEEN CHARACTERIZED BY OVERT OR SUBTLE RACIAL APPEALS

██ The court finds no evidence that political campaigns in Jackson have been characterized by overt or subtle racial appeals. Plaintiffs argument to the contrary is conclusory and unsupported by any evidence. Mr. T.C. Ozier, who has been involved in politics and civic affairs in the black community for many years, testified that white candidates have sought his support, and the support of other black voters, since 1930. Mr. Ozier gave the following testimony:

> "Q. All right, let me just ask the question again, sir. In the election campaigns of the present commissioners have you come across any racist campaign tactics?
>
> "A. Racist in a campaign?
>
> "Q. Racial comments about any of the candidates?
>
> "A. About any of the candidates that were running?
>
> "Q. Yes, in city commission elections?
>
> "A. No, I don't—I can't recall; no."

T. 362.

██ Plaintiffs contend that the publication of photographs of all candidates in the local newspaper is a racial appeal. Plaintiffs apparently argue that the photographs are published so that voters will know the race of each candidate, resulting in voting along racial lines. First, there is no evidence to support such a conclusion. Second, an argument could be made that the refusal of the local newspaper to publish photographs in black versus white elections would be racially discriminatory. Some black candidates regard the display of their photographs as helpful. If, as a result of the publication, some white voters

vote for a white candidate and some black voters vote for a black candidate, that is merely a fact of political life in Jackson. It is not a result of any overt or subtle racial appeal on the part of the news media. The court rejects plaintiffs' argument that such publication is an appeal to racial prejudice.

■ Plaintiffs also contend that black candidates have had difficulty in persuading white homeowners to permit their yards to be used for campaign advertising signs. Although there is evidence that some black candidates have encountered that difficulty, there is no evidence that the situation is the result of any overt or subtle racial appeal. Again, it is merely a fact of political life in Jackson.

Consequently, the court concludes that there is no evidence that political campaigns in Jackson have been characterized by overt or subtle racial appeals.

## H. THE EXTENT TO WHICH MEMBERS OF THE MINORITY GROUP HAVE BEEN ELECTED TO PUBLIC OFFICE IN THE JURISDICTION

■ Of all the factors described in the Senate Report as being probative to establish a violation of § 2, perhaps the most significant in Jackson is the fact that no black candidate has ever been elected to, or served on, the City Commission. A politically cohesive, geographically compact minority which exceeds 30% of the population of the City has been unable for over seventy years to have a member of the minority serve upon the governing authority of Jackson. "[T]he usual predictability of the majority's success distinguishes structural dilution from the mere loss of an occasional election." *Thornburg v. Gingles*, 106 S.Ct. at 2767.

■ Defendants point out that a black candidate has been elected in an at-large election to the Madison County Commission. Defendants contend that, because 85% of the residents of Madison County live within the city limits of Jackson, it is impossible to win a county election at-large without receiving a majority of the votes cast in the city. Although the logic of that contention is questionable, at least from a

statistical point of view, that fact is not relevant to the issues before the court. The Madison County Commission is a different governing body, with many more commissioners than the City, elected from a different group of voters, and having different duties and responsibilities. Thus, the court declines to consider the election of a black candidate to the Madison County Commission as being relevant to an inquiry of whether black candidates have been elected to the Jackson City Commission, the only political subdivision which is the subject of this litigation.

## I. WHETHER THERE IS A SIGNIFICANT LACK OF RESPONSIVENESS ON THE PART OF ELECTED OFFICIALS TO THE PARTICULARIZED NEEDS OF THE MEMBERS OF THE BLACK COMMUNITY

■ The current City Commissioners elected under the system challenged in this case have been responsive to the needs of black citizens. Each of the current members of the City Commission has sought black votes in his election campaigns. Blacks recently have been appointed to boards and commissions which advise the City Commission on the expenditure of funds and the approval of projects and, in some cases, directly appoint the administrators and approve the budgets of authorities which operate in the City of Jackson.

Further, the current City Commissioners, in recent years, have made substantial efforts to reduce and reverse the adverse effects of social conditions which existed before they took office. For example, in 1978, Jackson had 103 streets which were described as having broken or bumpy pavement and only twelve of those streets were in white neighborhoods. By 1986, only thirty-six broken or bumpy streets remained and seven of those were in white neighborhoods. From 1960 through 1980, 48.2% of the funds spent on non-arterial street improvement were spent in black areas and 51.8% were spent in white areas.

However, although the current City Commission has been responsive to the needs of

the black community in recent years, the inquiry must not stop there. The actions of three individuals over a relatively short period of time do not fully address the broader issue of whether officials elected by the challenged system are responsive to the needs of a minority. It is clear that for approximately fifty years of government under the Jackson City Commission, elected officials were *not* responsive to the needs of the black community. The fact that ninety-one of 103 inadequate streets in 1978 were located in black neighborhoods, the fact that in 1955 and prior thereto the City of Jackson employed no black supervisors, black policemen, or black firemen, and the fact that no black has ever been appointed as head of any department make it painfully obvious that the City Commission has not always been responsive to the needs of black citizens.

Further, even though the current commissioners are generally responsive to the needs of black citizens, there is no way to predict whether future commissioners under the challenged system will be responsive. While it is certainly possible that in the future Jackson will enjoy elected officials who will be responsive to the needs of all citizens, it would be speculation for this court to assume that such will be the case. The court, therefore, concludes that while the current commissioners and other commissioners in recent years have been responsive to the particularized needs of the black community, the Jackson City Commission, for the largest part of its history, has been markedly unresponsive to the needs of black citizens.

### J. WHETHER THE POLICY UNDERLYING THE CITY'S USE OF AT–LARGE ELECTION OF ITS COMMISSIONERS IS TENUOUS

■ At-large elections are, for all practical purposes, a requirement of the commission form of government. It would be anomalous to have a commission form of government without at-large elections since election of commissioners by district would result in one-third of the voters electing the Commissioner of Public Safety, a different one-third electing the Commissioner of

Streets, and the remaining one-third electing the Commissioner of Recreation. Therefore, the court finds that the use of an at-large election scheme to elect Jackson City Commissioners is not tenuous; on the contrary, it is a logical feature of the commission form of government.

■ Neither is the runoff provision tenuous. Many forms of government quite logically require that the winner of an election have a majority of the votes cast. Consequently, the court concludes that the use of at-large elections and runoff elections in the selection of Jackson's Board of Commissioners is not tenuous. That is not to say, however, that those provisions of the Jackson City Charter do not have an adverse impact upon the ability of black citizens to elect representatives of their choice, for clearly they do have such an adverse impact.

### K. THE TOTALITY OF THE CIRCUMSTANCES

■ In summary, the court concludes that there is a history of official discrimination in Jackson that touched the right of members of the black community to register, vote, or otherwise participate in the democratic process. Elections to the Jackson City Commission have been racially polarized. The challenged system uses a large election district (the city itself), a majority vote requirement, the equivalent of an anti-singleshot provision, and prior to 1979, a brief period between election and runoff. Black citizens in Jackson bear the effects of discrimination in such areas as education, employment, and health and these effects hinder their ability to participate effectively in the political process. No black citizen has ever been elected to, or served upon, the Jackson City Commission in the seventy-two years since the commission form of government was adopted in Jackson. Throughout most of the history of the Jackson City Commission, there has been a significant lack of responsiveness on the part of elected officials to the particularized needs of the black community.

On the other hand, black citizens have not been denied access to the candidate slating process, political campaigns have not been characterized by overt or subtle racial appeals, and the use of at-large voting and a runoff are not tenuous.

The court concludes, based upon the totality of the circumstances, that the political processes leading to nomination or election to the Jackson City Commission are not equally open to participation by black citizens in that black citizens have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

## IV. CONCLUSIONS OF LAW

1. This court has jurisdiction of the parties and subject matter pursuant to 28 U.S.C. § 1331. Although the defendant City Commissioners have been sued in both their official and individual capacities, there is no basis in plaintiffs' claim or in the evidence to support an action against them in their individual capacities.

2. Black citizens in Jackson are politically cohesive and are a sufficiently large and geographically compact group to constitute a majority in a single member district.

3. The white majority in Jackson votes sufficiently as a bloc to enable it usually to defeat the candidate preferred by black voters.

4. Plaintiffs and other black voters are submerged as a voting minority in Jackson, and, as a result, their voting power is diluted to such an extent that they have less opportunity than white citizens to participate in the political process and to elect representatives of their choice.

5. The at-large election of Jackson City Commissioners under the present system results in a denial or abridgement of the right of plaintiffs and other black voters to vote on account of race or color in violation of § 2 of the Voting Rights Act of 1965, as amended.

## V. REMEDY

Since the present system used to elect the members of the Jackson City Commission violates § 2 of the Voting Rights Act of 1965, as amended, plaintiffs are entitled to a remedy.

A hearing will be held on January 28, 1988, at 9:30 A.M. at which time evidence will be heard concerning an appropriate remedy in this action. The court will consider and the parties may present evidence concerning any form of government currently authorized by the Tennessee legislature which can be adopted without a private act, any form of government requiring a private act, or any modifications to the current form of government which would bring it into compliance with the Voting Rights Act.

Pending further orders of the court, the Board of Commissioners of the City of Jackson may continue to operate as the governing body of the City. However, defendants are enjoined from holding any elections under the current system, pending further orders of this court.

IT IS SO ORDERED.