William **MALLORY**, et al., Plaintiffs,

v.

George C. **EYRICH**, et al., Defendants.

Civ. No. C–1–86–1056.

United States District Court,
S.D. Ohio, W.D.

Feb. 24, 1989.

---

Thomas Atkins, Margrett Ford, Brooklyn, N.Y., James Hardiman, Cleveland, Ohio, Peter Randolph, Cincinnati, Ohio, for plaintiffs.

James Harper, Cincinnati, Ohio, Andrew Sutter, Columbus, Ohio, for defendants.

## ORDER

CARL B. RUBIN, Chief Judge.

This matter is before the Court on plaintiffs' motion for summary judgment (doc. no. 14); defendants' opposing memoranda and the Hamilton County, Ohio defendants' motion for summary judgment (doc. nos. 20, 21, 36 and 37); and plaintiffs' reply memorandum (doc. no. 24).

### Procedural Background

Plaintiffs bring this action alleging that the current method of electing judges to the Hamilton County, Ohio Municipal Court violates the Voting Rights Act of 1965, as amended (42 U.S.C. § 1973 et seq.); the Civil Rights Act of 1871, 42 U.S.C. § 1983; the Fifth, Fourteenth, and Fifteenth Amendments to the United States Constitution; and the Equal Protection Clause of the Ohio Constitution. On August 14, 1987 this Court granted summary judgment in defendants' favor on the grounds that Section 2 of the Voting Rights Act does not apply to judicial elections, and it is not a function of the federal courts to carve a municipal court into judicial districts based upon the population mix of blacks and whites. On appeal, the United States Court of Appeals for the Sixth Circuit found that judicial elections are not exempted from the Voting Rights Act and reversed and remanded the case, 839 F.2d 275. Following remand, plaintiffs and defendants seek summary judgment.

### Summary Judgment

The summary judgment procedure under Fed.R.Civ.P. 56 is designed to secure a just, speedy, and inexpensive determination of any action. *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). However, Rule 56(c) permits the Court to grant summary judgment as a matter of law *only* after the moving party has identified as the basis of its motion "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any" which demonstrate the absence of any genuine issue of material fact. *Id.* at 323, 106 S.Ct. at 2553. The party opposing a properly supported motion for summary judgment "may not rest upon mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (*quoting, First National Bank of Arizona v. Cities*

*Service Co.,* 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)). The evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513 (*citing Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970)). The function of the court is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510. There is no genuine issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510 (*citing Cities Service,* 391 U.S. at 288–289, 88 S.Ct. at 1592–1593). If the evidence is merely colorable, *Dombrowski v. Eastland,* 387 U.S. 82, 87 S.Ct. 1425, 18 L.Ed.2d 577 (1967) or is not significantly probative, *Cities Service,* 391 U.S. at 290, 88 S.Ct. at 1593, judgment may be granted. *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510.

### Facts

The following facts are not in dispute: Prior to September 3, 1965, the Cincinnati Municipal Court and the Hamilton County Court existed in Hamilton County. Effective September 3, 1965, the Ohio General Assembly amended Ohio Revised Code Chapter 1901 to create the Hamilton County Municipal Court. In 1967, the Cincinnati Municipal Court was merged into the Hamilton County Municipal Court. The Hamilton County Municipal Court is a multi-judge, single district court with jurisdiction throughout Hamilton County. Judges are nominated by petition signed by 1000 electors of the County. Any vacancy created in the Court is filled by the Governor of the State of Ohio until a successor for that position is elected. Judges are elected for six-year terms through a nonpartisan ballot. Elections are held in odd-numbered years. The electorate for these judgeships consists of all eligible voters in Hamilton County.

A black Republican, William N. Lovelace, was elected judge of the Cincinnati Municipal Court in the November 2, 1965 election. Nine subsequent municipal court judicial elections occurred in the period between 1965 and 1986 in which black candidates ran for judgeships. During this period, every time a black candidate for Hamilton County Municipal Court judge ran against a white candidate, the white candidate won the election.

In the election of 1983, the leaders of the Democrat and Republican parties agreed that two newly-created judgeships should be held by blacks. One black from each party ran unopposed and was elected. Subsequent to the institution of this lawsuit, a black, Nadine Allen, faced a white opponent in the 1987 Hamilton County Municipal Court election and won.

### The Voting Rights Act of 1965

Plaintiffs contend that the at-large and multi-member district system for electing judges to the Hamilton County Municipal Court violates Section 2 of the Voting Rights Act of 1965, as amended June 29, 1982. Specifically, plaintiffs allege that the current election system impairs black citizens' ability to elect representatives of their choice by diluting the black vote through submergence in a multi-member district.[1]

Section 2 reads as follows:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 4(f)(2), as provided in subsection (b).

(b) A violation of subsection (a) is established if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivi-

---

1. A multi-member district is a single district in which at-large voting is conducted. *Carrolton*

*Branch of NAACP v. Stallings,* 829 F.2d 1547 (11th Cir.1987).

sion are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C. § 1973.

■■■ In order to establish a Section 2 violation, plaintiffs need not prove a discriminatory intent. *Thornburg v. Gingles*, 478 U.S. 30, 43–44, 106 S.Ct. 2752, 2762–2763, 92 L.Ed.2d 25 (1987). The question to be resolved is whether the challenged electoral practice or structure has the result of depriving plaintiffs of an equal opportunity to participate in the political processes and to elect candidates of their choice. *Id.* at 44, 106 S.Ct. at 2763. Plaintiffs have the burden of proving that under the totality of the circumstances to be considered, the challenged electoral device results in unequal access to the electoral process. *Id.* at 46, 106 S.Ct. at 2764. To meet their burden in a vote dilution case, plaintiffs must prove that the challenged device operates to minimize or cancel out minority voters' ability to elect their preferred candidates. *Id.* at 48, 106 S.Ct. at 2766.

The Senate Judiciary Committee Majority Report accompanying the legislation that amended Section 2 in 1982 enumerates several factors that may be probative of a Section 2 violation. These factors are:

(1) The extent of any history of voting related discrimination in the state or political subdivision;

(2) The extent to which voting in the elections of the state or political subdivision is racially polarized;[2]

(3) The extent to which the state or political subdivision has used unusually large election districts or other procedures that may enhance the opportunity for discrimination against minority groups;

(4) Whether the minority group has been denied access to a candidate slating process, if any exists;

(5) The extent to which the minority group in the State or political subdivision bears the effects of discrimination in other areas, such as education or housing, which hinder its ability to participate effectively in the political process;

(6) Whether political campaigns have been characterized by overt or subtle racial appeals; and

(7) The extent to which members of the minority group have been elected to public office in the jurisdiction.

This list is neither comprehensive nor exclusive. *Id.* at 45, 106 S.Ct. at 2763. Whether political processes are equally open to voters depends upon a "practical evaluation of 'past and present reality'" and a "functional view of the political process." *Id.*

Two of the factors listed in the Senate Majority Report are most significant in analyzing a vote dilution claim. Foremost among these, and the key element in a vote dilution claim, is racial bloc voting or racial polarization. *Id.* at 55, 106 S.Ct. at 2769. The second factor is the extent to which members of the minority group have been elected to public office in the jurisdiction. *Id.; Stallings*, 829 F.2d at 1555. The remaining factors are supportive of a vote dilution claim where racial bloc voting is found, but are not essential. *Stallings*, 829 F.2d at 1555.

■■■ There are certain limitations on the circumstances under which a Section 2 violation may be proved. First, electoral devices, such as at-large voting, may not be considered *per se* violative of Section 2. *Gingles*, 478 U.S. at 46, 106 S.Ct. at 2764. Second, the combination of an allegedly

---

**2.** Racial polarization exists when there is a consistent relationship between the race of a voter and the way in which he votes or, stated otherwise, when black voters and white voters vote differently. *Gingles*, 478 U.S. at 53 n. 21, 106 S.Ct. at 2768 n. 21.

dilutive electoral mechanism and lack of proportional representation alone does not establish a Section 2 violation. *Id.* Finally, the existence of racial bloc voting cannot be assumed: plaintiffs must prove it. *Id.*

■ In order to establish that multi-member districting constitutes a Section 2 violation, plaintiffs must prove three necessary preconditions. *Id.* at 50, 106 S.Ct. at 2766. First, the minority group must be sufficiently large and geographically compact to constitute a majority in a single-member district. *Id.* This precondition may not be satisfied when the minority group is spread evenly throughout a multimember district or, if geographically compact, is so small in relation to the surrounding white population that it could not constitute a majority in a single member district. *Gingles,* 478 U.S. at 50 n. 17, 106 S.Ct. at 2766 n. 17. The purpose of this requirement is to insure that the minority group has the potential to elect its own candidates. *McNeil v. Springfield Park District,* 851 F.2d 937 (7th Cir.1988). Otherwise, the minority cannot claim to have been injured by the challenged structure. Second, the minority group must show that it is politically cohesive. *Gingles,* 478 U.S. at 51, 106 S.Ct. at 2767. This precondition is satisfied if a significant number of minority group members usually vote for the same candidates. *Id.* at 56, 106 S.Ct. at 2770. Third, the minority group must demonstrate that the white majority votes sufficiently as a bloc to enable it usually to defeat the minority's preferred candidate. *Id.* at 51, 106 S.Ct. at 2767. It is the usual predictability of the majority's success that distinguishes structural dilution from the mere loss of an occasional election. *Id.*

### Racial Bloc Voting

The extent of bloc voting necessary to demonstrate that the minority's ability to elect its preferred representatives is impaired varies according to several factual circumstances, so that the court must undertake an inquiry into minority and majority voting practices. *Id.* at 55–56, 106 S.Ct. at 2769–2770. The factors to be examined is determining the amount of white bloc voting necessary to minimize or cancel the minority vote include: (1) the nature of the allegedly dilutive electoral mechanism; (2) the presence or absence of other potentially dilutive electoral devices; (3) the percentage of voters in the district who are members of the minority group; (4) the size of the district involved; and (5) the number of positions open and the number of candidates in the field. *Id.* at 56, 106 S.Ct. at 2770. To determine whether whites vote sufficiently as a bloc to defeat the minority's preferred candidates, the court must look to the strength of the minority support plus white crossover votes. *Id.* at 56, 106 S.Ct. at 2770. If the majority white vote will normally defeat that vote, the degree of racial bloc voting is legally significant. *Id; Stallings,* 829 F.2d at 1557.

■ A pattern of bloc voting over an extended period of time is more probative of legally significant bloc voting than are isolated incidents. *Gingles,* 478 U.S. at 57, 106 S.Ct. at 2770. Furthermore, limited success of the minority group's preferred candidates at the polls does not foreclose a vote dilution claim. *Id.; Zimmer v. McKeithen,* 485 F.2d 1297, 1307 (5th Cir. 1973).

### Race of the Candidates

In analyzing a vote dilution claim, it is the status of a candidate as the chosen representative of a minority group, not the race of the candidate, that is important. *Gingles,* 478 U.S. at 68, 106 S.Ct. at 2776. Only the race of the *voter* is relevant. Nonetheless, as the *Gingles* Court noted, the race of voter and candidate is often correlated in that black voters prefer black candidates while white voters prefer white candidates.

Federal courts that have addressed Section 2 vote dilution claims subsequent to *Gingles* have disagreed as to what significance the race of a candidate has. It has been held that implicit in *Gingles* is the notion that the preferred candidate of black voters is to be determined from elections that offer the choice of a black candidate. *Citizens for a Better Gretna v. City of*

*Gretna, La.*, 834 F.2d 496, 504 (5th Cir. 1987). The Court in *Gretna* determined that although evidence may establish that blacks support white candidates acceptable to the white majority, that fact does not negate instances in which white voters defeat a preferred black candidate. *Id.* at 501–502. Therefore, the Court declined to consider evidence of elections in which only white candidates participated. *Id.* at 504.

One district court in this Circuit has held that in assessing a Section 2 claim, the Court may consider elections in which no members of the minority group ran to determine whether the minority has less opportunity than other members of the electorate to elect representatives of their choice. *Buchanan v. City of Jackson, Tenn.*, 683 F.Supp. 1515, 1531 (W.D.Tenn. 1988). However, elections in which minority candidates have participated are more probative of racial polarization. *Id.* Additionally, an election involving only white candidates in which black votes do not effect the outcome is not significant to a determination of whether candidates favored by black voters are usually defeated by a bloc voting white majority. *Id.*

### Expert Evidence

The parties do not dispute the accuracy of the election statistics submitted by either side. Rather, they disagree as to how those statistics should be interpreted. Plaintiffs rely essentially on a study by Lois M. Pelekoudas, Associate Professor of Political Science at Central State University, in support of their claim that the undisputed facts show that they are entitled to summary judgment. Pelekoudas studied elections for the Hamilton County Courts during the period from 1967 to 1985. She focused primarily on four elections involving two candidates, one white and one black. Two of the elections were for judgeships on the Hamilton County Court of Common Pleas and two were for judgeships on the Hamilton County Municipal Court. Pelekoudas compared votes in the City's six "most black" and six "least black" wards for each election.[3] In the two Municipal Court elections, the black candidate received 73% to 86% of the vote in the "most black" wards and 35% to 42% of the vote in the "least black" wards. In the Common Pleas Court elections, the black candidates received 72% of the vote in the "most black" wards and 26% to 41% of the vote in the "least black" wards. Pelekoudas found the differences in voting in each election to be statistically significant at the .05 level.

Pelekoudas also compared a 1976 race between two white candidates for a single Common Pleas Court judgeship, in which she concluded that party affiliation was a factor, with a similar 1976 race involving a head-to-head contest between one white and one black candidate. Pelekoudas determined from the statistics that race was a more important factor than party affiliation in the black candidate's defeat in the 1976 election.

Pelekoudas noted that in each of the four elections on which she focused, factors other than race, such as party affiliation, incumbency, sex or individual qualities and campaigns, could explain the results. However, she found a similar voting pattern concerning race in each election, in that blacks did well in black wards and much poorer in white wards. Pelekoudas concluded on the basis of her analysis of the total ten judicial elections in Hamilton County over the period studied that election to the Hamilton County Municipal or Common Pleas Court of a black candidate who runs opposed is extremely unlikely in the foreseeable future, if not impossible.

In response to plaintiffs' motion for summary judgment and in support of their motion, defendants have submitted a report and affidavit by Alfred J. Tuchfarber, Jr., Ph.D., Director of the Institute for Policy Research at the University of Cincinnati and Associate Professor of Political Science. Tuchfarber criticizes Pelekoudas' report on a number of grounds. He asserts that several questionable assumptions undermine her conclusions, including an as-

---

**3.** The "most black" and "least black" wards are calculated from the percentages of blacks in election wards in the City of Cincinnati based on census reports for 1970 and 1980.

sumption that judges should be evaluated in the same manner as other elected officials. Tuchfarber also criticizes the fact that Pelekoudas examined only voter support for black candidates, rather than voter support for candidates of any race who are supported by black voters. Furthermore, he asserts that her use of an "extreme case analysis" is questionable,[4] since a bivariate or multivariate ecological regression analysis which takes into account factors other than race, such as party endorsement, incumbency, and the city/suburb residence of voters, would provide a more accurate picture.[5] Tuchfarber also questions Pelekoudas' conclusions regarding racial bloc voting. In so doing, he places great emphasis on the fact that in one election involving a black candidate, the black candidate received the same percentage of votes in the most white wards as did the white candidates. Tuchfarber also relies on his determination that for the period from 1977 to 1985, 44% of the judges elected to the Hamilton County Municipal Court were the chosen candidates of voters in the "most black" wards as defined by Pelekoudas. Tuchfarber asserts on the basis of these findings that evidence of racial bloc voting in the "most white" wards is lacking, as is evidence of the remaining *Gingles* factors.

Tuchfarber concludes that creation of single-member districts in Hamilton County would probably lead to the election of one or two Municipal Court Judges in the City of Cincinnati. However, he notes that this same result has been attained in the past by the appointment of blacks to the bench and by the parties running unopposed black candidates for municipal court judgeships.

*Summary Judgment is not Appropriate*

■ Upon careful examination of the record, the Court concludes that the record is not sufficiently developed to permit summary judgment in favor of any party. Plaintiffs may be able to prove that the three preconditions necessary to establish a vote dilution claim are present. First, both parties apparently agree that if municipal court judges were drawn from single-member districts, or if the Municipal Court were to be divided into a Cincinnati Court and a Hamilton County Court, blacks could be elected to municipal court judgeships. While Pelekoudas' report is unclear as to whether she believes blacks could be elected if single-member districts were drawn, plaintiffs are not foreclosed from proving that such is the case. Therefore, plaintiffs may satisfy the first precondition that the minority group be sufficiently large and geographically compact to constitute a majority in a single-member district.

Second, the precondition that the minority group be politically cohesive may be met in this case. In the four elections on which Pelekoudas focused, the black candidate received 72–86% of the vote in the "most black" wards. It would therefore appear that a significant number of blacks usually vote for the same candidates, or at least for the same black candidates. If so, then the requirement that the minority group be politically cohesive is satisfied.[6] See *Gingles*, 478 U.S. at 59, 106 S.Ct. at 2771.

The last precondition to be met is whether the white majority votes sufficiently as a bloc to enable it to defeat the minority's preferred candidates. In answering this inquiry affirmatively, Pelekoudas focused only on those elections in which a black candidate participated. Defendants contend that the Court must also examine those elections in which no blacks ran. However, as discussed earlier in this opinion, such races are less probative of racial

---

4. Tuchfarber refers to Pelekoudas' method of comparison of the "most black" and "least black" wards as extreme case analysis.

5. Both extreme case analysis and bivariate ecological regression analysis have been recognized as standard and acceptable methods of analysis. *Gingles*, 478 U.S. at 53 n. 20, 106 S.Ct. at 2768 n. 20.

6. As defendants point out, Pelekoudas' analysis does not take into account wards with a high percentage of blacks outside of the City of Cincinnati but within Hamilton County. It is not clear from the record whether and in what manner inclusion of these wards in an examination of minority and majority voting practices would change the results of Pelekoudas' analysis.

954

polarization than are those races in which blacks oppose whites. Moreover, defendants' conclusion that black voters have been able to elect their preferred candidates in 44% of the elections between 1977 and 1985 is of questionable relevance. In reaching this conclusion, Tuchfarber examined five elections in which a number of candidates ran for a limited number of seats. Only three of these elections included black candidates. Tuchfarber noted that in each election, a certain number of the white candidates elected were among the top choices of black voters. However, Tuchfarber neglects to note that in those elections in which black candidates ran, black voters heavily or overwhelmingly supported the unsuccessful black candidates as their top preferred candidates. This pattern undermines defendants' conclusion that black voters have been able to regularly elect their preferred candidates.

Additionally, in attempting to illustrate an alleged lack of racial bloc voting, Tuchfarber places heavy reliance on one election in which a black candidate received wide white voter support to illustrate an alleged lack of racial bloc voting. However, this one instance is insufficient to support a finding that whites do not regularly vote as a bloc to defeat black voters' preferred candidates. Thus, based on the evidence before it, the Court concludes that plaintiffs are not foreclosed from proving that whites vote sufficiently as a block to defeat blacks' preferred candidates, so as to satisfy the third precondition of a vote dilution claim.

In addition to the three preconditions necessary to establish a vote dilution claim, the evidence demonstrates that plaintiffs may be able to establish the key element of such a claim, i.e. that the degree of racial bloc voting in Hamilton County judicial elections is legally significant. The second necessary element of a vote dilution claim is clearly met, since during the twenty-year period examined by the parties, no blacks have been elected to either the Hamilton County Municipal Court or the Hamilton County Common Pleas Court. Further development of the record is necessary to enable the Court to conduct a "searching and practical evaluation" of the Hamilton County political process and determine whether the remaining *Gingles* factors support plaintiffs' claim that blacks have been denied equal access to the electoral process.

### Conclusion

Although the pertinent statistics for Hamilton County judicial elections are not in dispute, the parties disagree as to the interpretation to be given such statistics. Full development of the record is necessary in order to determine the appropriate interpretation of the pertinent facts and to resolve the disputed issues presented by the experts' analyses. For these reasons, defendant Hamilton County Board of Elections' motion for summary judgment and plaintiffs' motion for summary judgment are hereby DENIED.

IT IS SO ORDERED.