**William MALLORY, et al., Plaintiffs,**

v.

**George C. EYRICH, et al., Defendants.**

Civ. No. C–1–86–1056.

United States District Court,
S.D. Ohio, W.D.

July 18, 1989.

Thomas Atkins, Margaret Ford, Brooklyn, N.Y., James Hardiman, Cleveland, Ohio, Peter Randolph, Cincinnati, Ohio, for plaintiffs.

James Harper, Cincinnati, Ohio, Andrew Sutter, Bennett Manning, Columbus, Ohio, for defendants.

ORDER

CARL B. RUBIN, Chief Judge.

### I. Introduction

This matter was commenced by a complaint filed on October 16, 1986. Suit was brought by named plaintiffs William Mallory, Arthur Primus, Vera Johnson, Charles Collins and Mary Ann Randolph against the following Defendants: George C. Eyrich, Chairman of the Hamilton County Board of Elections; John H. Hermanies, John A. Wiethe, and Don Driehaus, Members of the Hamilton County Board of Elections; the State of Ohio; Richard F. Celeste, Governor; and Sherrod Brown, Secretary of State. The complaint alleged that Ohio Revised Code § 1901.07 violated § 2 of the Voting Rights Act of 1965 as amended in 1982 (42 U.S.C. § 1973) (Act). Ohio Revised Code § 1901.07 provides in part for the creation of the Hamilton County Municipal Court whose judges "shall be elected by the electors of the territory within the jurisdiction of the court at the regular municipal election and in the same manner provided by law for the election of judges for the Court of "Common Pleas...." Both the Municipal Court and the Common Pleas Court have jurisdiction coterminous with the geographical limits of Hamilton County, Ohio, and each is composed of multiple judges all of whom are elected by all of the electors of Hamilton County.

Section 2 of 42 U.S.C. § 1973 as amended in 1982 provides:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 4(f)(2) [42

USCS § 1973b(f)(2) ], as provided in subsection (b).

(b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That, nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

Defendant Hamilton County Board of Elections filed a Motion for Summary Judgment (doc. 20), memoranda were filed by both sides and a hearing was held in open court on July 24, 1987. Pursuant to those memoranda and that hearing, this Court issued an Order on August 11, 1987, granting the Motion for Summary Judgment (doc. 29). That Order was subsequently published in 666 F.Supp. 1060 to which reference is hereby made. The basis of the motion was a limited one. The findings of the Court were equally limited. The sole issue considered was the applicability of the Act to the elected position of Judge. This Court held that it did not apply.

An appeal was taken to the United States Court of Appeals for the Sixth Circuit. On February 12, 1988, a panel consisting of The Honorable Pierce Lively, Chief Judge, The Honorable Harry Wellford, Circuit Judge, and The Honorable Robert M. McRae, Senior Judge of the United States District Court for the Western District of Tennessee, reversed the holding of this Court in an opinion published in 839 F.2d 275 (6th Cir.1988).

Just as this Court's holding was a limited one, so the determination by the United States Court of Appeals for the Sixth Circuit was equally limited. Portions, however, of that Court's opinion are pertinent in the further consideration of this litigation. In the majority opinion written by then Chief Judge Lively the following appears:

As previously noted, the district court stated in its order that the record would support granting relief to the plaintiffs under a "results" standard. The plaintiffs urge us to treat this as the district court's ultimate finding if we conclude that Section 2 applies, and *remand only for development of an appropriate remedy.* Since the case was decided by the district court on summary judgment without a fully developed record, we believe the better course is to *remand on all issues.* (emphasis added).

It should be noted in passing that this is a matter of first impression in this Circuit and indeed little, if any, instruction is available in any circuit. It is for that reason that any assistance by way of direction from an appellate court should be scrutinized carefully in order to proceed further in an appropriate fashion. In this regard, the concurring opinion of Judge Wellford is likewise instructive. That concurrence contains the following language:

I write to emphasize that the Voting Rights Act, as amended, does not assure that candidates, by reason of race or color, should be elected in proportion to their percentage of the voting population at any given time. 42 U.S.C. § 1975(b) establishes no "right to have members of a protected class [be] elected in numbers equal to their proportion in the population." *The effect of our decision is to remand this case for the opportunity of the parties to develop evidence,* including the results of the judicial election which plaintiffs unsuccessfully sought to enjoin. (Emphasis added)

Upon remand this matter was returned to the trial docket of this Court for the purpose of establishing the record requested. Both sides thereupon filed Motions for Summary Judgment. Those motions and the appropriate memoranda include doc-

uments 14, 20, 21, 36 and 37. On February 24, 1989, this Court denied summary judgment to each side (doc. 42) and assigned this matter for trial. 707 F.Supp. 947. Such trial was scheduled to begin on May 8, 1989. In preparation thereof a Final Pretrial Conference was held on April 19, 1989, and a Final Pretrial Order issued (doc. 45). At no time prior to one week before trial was it ever suggested by either side that this matter could be decided without a full trial to the Court with the presentation of evidence and testimony. On May 5, 1989, however, Defendants State of Ohio, Richard F. Celeste, Governor of Ohio, and Sherrod Brown, Secretary of State of Ohio, offered to allow judgment to be taken against them pursuant to Rule 68, Fed. R.Civ.P. (doc. 47). At the same time the Board of Elections of Hamilton County, Ohio, likewise offered to consent to judgment with Mr. Brown, Secretary of State, casting a tie-breaking vote under Ohio Revised Code § 3501.11 (doc. 51). Members Eyrich and Hermanies of the Hamilton County Board of Elections voted against such offer. The Plaintiffs in this matter thereupon accepted the offer of judgment and requested the Clerk of this Court to enter liability judgment in Plaintiffs' favor (doc. 46).

On May 15, 1989, Defendant George C. Eyrich moved to dismiss the action for lack of subject matter jurisdiction in the absence of a genuine controversy between the parties (doc. 48). Memoranda in opposition to such motion have been filed (doc. 49 and 52) and now this matter is before the Court for decision on such motion.

The status of this matter calls into question some fundamental considerations of the relationship between the federal courts and the state legislature, the inherent power of the General Assembly of Ohio, the Constitution of the State of Ohio and the ability of a trial court to follow instructions given to it by an appellate court. Such issues go far beyond the specific controversy set forth herein. A matter of this consequence should be reviewed by an appellate court and hopefully by the Supreme Court of the United States. This Court therefore proposes to examine the current problem in some detail.

## II. *Significant Decisions*

While the Court finds no appellate case precisely on point, there are precedential decisions available for guidance.

A. *Whitcomb, Governor of Indiana v. Chavis*, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971).

Suit was brought challenging state statutes of Indiana establishing Marion County as a multimember district for the election of state senators and representatives. The plaintiffs had alleged that the laws invidiously diluted the votes of negroes and poor persons and that voters in multimember districts were overrepresented. A Three Judge Court held that the statutes operated to minimize and cancel out the voting strength of the minority group and that the statutes in question were unconstitutional. The Supreme Court of the United States reversed that decision.

*Whitcomb v. Chavis* predates the 1982 amendment of the 1965 Voting Rights Act. It is not suggested as controlling in this matter. It is the opinion of Justice Douglas, however, that is persuasive and worthy of note. In an opinion which concurred in part and dissented in part from the majority, Justice Douglas made the following observation:

The merits of the case go to the question ... whether a gerrymander can be "constitutionally impermissible." The question of the gerrymander is the other half of *Reynolds v. Sims*, 377 U.S. 533 [84 S.Ct. 1362, 12 L.Ed.2d 506 (1964)]. Fair representation of voters in a legislative assembly—one man, one vote— would seem to require (1) substantial equality of population within each district and (2) the avoidance of district lines *that weigh the power of one race more heavily than another.* The latter can be done—and is done—by astute drawing of district lines that makes the district either heavily Democratic or heavily Republican as the case may be. Lines may be drawn so as to make the voice of one

racial group weak or strong, as the case may be. (Emphasis added)

B. *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979).

*Bell v. Wolfish* did not deal with an election apportionment issue. It dealt instead with federal court supervision of a penal institution. The language, however, of then Justice Rehnquist describing a basic principle of judicial restraint is worthy of note. His cogent statement is as follows:

> Judges, after all, are human. They, no less than others in our society, have a natural tendency to believe that their individual solutions to often intractable problems are better and more workable than those of the persons who are actually charged with and trained in the running of the particular institution under examination. *But under the Constitution, the first question to be answered is not whose plan is best, but in what branch of the Government is lodged the authority to initially devise the plan.* This does not mean that constitutional rights are not to be scrupulously observed. It does mean, however, that the inquiry of federal courts into prison management must be limited to the issue of whether a particular system violates any prohibition of the Constitution, or in the case of a federal prison, a statute. The wide range of "judgment calls" that meet constitutional and statutory requirements are confided to officials outside of the Judicial Branch of Government.

*Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). (Emphasis added)

C. *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964).

This case involved an alleged malapportionment of the Alabama legislature and is significant herein only because a Three Judge Federal District Court declined to order that a forthcoming primary election be held at large stating that it should not act before the legislature had further op-

portunity to take corrective measures before the general election.

We feel that the District Court in this case acted in a most proper and commendable manner. It initially acted wisely in declining to stay the impending primary election in Alabama, and properly refrained from acting further until the Alabama Legislature had been given an opportunity to remedy the admitted discrepancies in the State's legislative apportionment scheme, while initially stating some of its views to provide guidelines for legislative action. And it correctly recognized that legislative reapportionment is primarily a matter for legislative consideration and determination, and that judicial relief becomes appropriate only when a legislature fails to reapportion according to federal constitutional requisites in a timely fashion *after having had an adequate opportunity to do so.* (Emphasis added), *Supra* at 585, 586, 84 S.Ct. at 1393, 1394.

D. *Wise v. Lipscomb*, 434 U.S. 1329, 98 S.Ct. 15, 54 L.Ed.2d 41 (1977).

(Note: This is the opinion of Justice Powell acting solely in his capacity as Circuit Justice in an application for stay of a Court of Appeals Judgment which directed the District Court to require the exclusive use of single members districts in the election of a Dallas, Texas city council.) Of significance is the following statement: "Reapportionment is primarily the duty and responsibility of the state through its legislature or other body rather than a federal court. Citing *Chapman v. Meier*, 420 U.S. 1, 95 S.Ct. 751, 42 L.Ed.2d 766 (1975); *Reynolds v. Sims*, 377 U.S. 533, 586, 84 S.Ct. 1362, 1394, 12 L.Ed.2d 506 (1964).

III. *Opinion*

The problem confronting the Court, while not unprecedented, is quite unusual. The parties [1] have simply determined that this Court must exercise jurisdiction and remedy an asserted statutory violation while denying the Court an opportunity to inquire whether a violation does exist. What

---

1. The term "parties" as used herein is limited to those who consented to judgment. That term

does not include either Mr. Eyrich or Mr. Hermanies.

the parties seek is of sufficient magnitude to require an inquiry into its ramifications. Just about the last thing that the federal jurisprudence of the late Twentieth Century needs is a District Court with its feet firmly planted in midair fashioning a remedy for an imperfectly described and perhaps nonexistent condition. Not only has this Court been prevented from complying with the mandate of the United States Court of Appeals for the Sixth Circuit, it is also called upon to usurp a function reserved to the legislature. At the very least that legislature should have a reasonable opportunity to perform its lawful function.

Since this matter may have significant consequences, it might be useful to point out what a judicial decision might create:

(1) If, as the parties suggest, all that remains is for this Court to create one or more judicial districts in Hamilton County wherein a black candidate is assured of election, does the same reasoning then apply to the Common Pleas Court of Hamilton County, Ohio, where the same population conditions exist and the same procedure for election has been mandated? Is it the function of this Court to declare that the law of Ohio creating the Common Pleas Court is now unconstitutional since it provides for the at-large election of judges? Is the distinction between "constitutional" courts and "legislative" courts significant and if not, is a Federal Court to undertake a reorganization of the Courts of Common Pleas based upon this precedent?

(2) There is but one choice of remedy. Either the judges of the Municipal Court of Hamilton County will be elected at large or there will be created judicial districts within which separate candidates will run. If this Court must carve out of Hamilton County a district or districts where the black population so predominates as to insure the election of black candidates, what effect does this have upon those blacks who are not within such districts? Has this Court effectively disenfranchised those voters from electing a judicial candidate of their choice? Does the Voting Rights Act therefore reward only those who live within a gerrymandered district and not apply to those black voters who have been excluded? Is the alternative a district or districts that are so drawn as to include every black voter within Hamilton County, Ohio?

(3) The foregoing only begins to describe what may occur. Must this Court retain jurisdiction indefinitely in order to redraw the lines for such district in advance of each election to the Hamilton County Municipal Court? The Court will take judicial notice that population patterns shift. The district which complies with the Act in 1989 may not in 1991. A constant redrawing of district lines may violate the exception in the Voting Rights Act which denies a "right to have members of a protected class be elected in numbers equal to their proportion in the population."

The Court notes that in a related situation the Supreme Court of the United States required a District Court dealing with school segregation to remedy the situation only once. Thereafter, if changes in population occurred, the Court was not required to prepare subsequent plans. *See Pasadena City Board of Education v. Spangler,* 427 U.S. 424, 96 S.Ct. 2697, 49 L.Ed.2d 599 (1976).

The concerns above listed point inescapably to a recognition that this is a legislative and not a judicial problem. At a time when there appears to be a growing dismay at the power exercised by courts over every facet of contemporary life, it is somewhat startling to note that a named plaintiff in this litigation is not only a veteran member of the General Assembly of Ohio, he is Majority Leader of the Ohio House of Representatives and one of its outstanding leaders. This is in the first instance a legislative concern.

The Court makes one further observation regarding the dilemma with which it is confronted. The Court will take judicial notice that the Plaintiffs and those Defendants who have joined to confess judgment are all members of the same political party. The Court also notes that the election of Judges for the Municipal Court of Hamilton County has traditionally involved endorsements by political parties, even

though such Judges technically run in a "nonpartisan" election.

The concept of "separation of powers" is fundamental to our form of government. Predictably, during our history, there have been periods when one or another of the three branches of government appears to predominate. There is reason to believe that during the last generation it is the judicial power that has been preeminent. As far back as the Federalist Papers it was urged by James Madison that "in republican government the legislative authority necessarily predominates." *The Federalist* No. 51, p. 350, J. Cooke Edition, 1961. As recently as the past session of the Supreme Court of the United States Justice Blackmun pointed out "the judicial branch [should] neither be assigned nor allowed 'tasks that are more appropriately accomplished by [other] branches.'" (*cited in Mistretta v. United States,* — U.S. —, 109 S.Ct. 647, 660, 102 L.Ed.2d 714 (1989) (*citing Morrison v. Olson,* — U.S. —, 108 S.Ct. 2597, 2601, 101 L.Ed.2d 569 (1988)).

This Court can only reach the conclusion that what is involved here is essentially a legislative matter and should not be undertaken by the judiciary. The Court will retain jurisdiction of this case and conduct an inquiry after the General Assembly of Ohio has had an opportunity to examine the matter. The Court will take judicial notice that the next session of the General Assembly of Ohio will begin in January, 1990. The Motion to Dismiss for "Lack of Controversy" is hereby denied without prejudice to a resubmission at a later time.

IT IS SO ORDERED.